UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| MICHAEL SHANNON,               ) | |
| )| |
|           PLAINTIFF     )| |
| ) | |
| v.                             ) | CIVIL NO. 08-343-P-H |
| ) | |
| SARTO ANTHONY SASSEVILLE,      ) | |
| ) | |
|           DEFENDANT    ) | |

## MEMORANDUM DECISION AND ORDER ON DEFENDANT'S MOTION FOR A NEW TRIAL, JUDGMENT AS A MATTER OF LAW AND REMITTITUR OF PUNITIVE DAMAGE AWARD

The issues here are, first, whether the evidence at trial supported a jury verdict of punitive damages against a man found liable for molesting his seven-year-old nephew[1] and, second, whether a punitive damage award of $1.1 million on top of a compensatory award of $150,000 is excessive as a matter of state law or federal constitutional law.  I conclude that the evidence fully supports a punitive damage verdict under the standards of both Rule 50 (motion for judgment as a matter of law) and Rule 59 (motion for new trial). The defendant's Motions for Judgment as a Matter of Law and for a New Trial on punitive damages are therefore **DENIED**.[2]  I also **DENY** the Motion for Remittitur of the award.  While the punitive damage award here is large

---

[1] The child may have been young as six.  The age is uncertain because the lawsuit was brought only after the plaintiff became an adult.
[2] The defendant made clear that he is attacking only the punitive damage verdict in the motions.  Def.'s Mot. for New Trial, J. as a Matter of Law, and Remittitur Respecting Punitive Damage Award at 2 n.2 (Docket Item 188).

compared to the compensatory award, I conclude that it is not contrary to Maine common law or federal constitutional law given the reprehensibility of the defendant's act coupled with Maine's legitimate interest in punishing and deterring child molestation.

## FACTUAL AND PROCEDURAL BACKGROUND

After becoming an adult, the plaintiff Michael Shannon sued his uncle, the defendant Sarto Sasseville, for battery, intentional infliction of emotional distress, and negligent infliction of emotional distress under Maine law. The case went to trial on December 15, 2009. At trial, the jury heard Shannon testify that when he was six or seven, he and his family visited Sasseville's home for a family gathering. Shannon testified that Sasseville (his uncle and godfather) took him into a bathroom on that occasion and fondled his genitals. Three of Sasseville's daughters testified that he had also molested them on multiple occasions when they were children.[3] In deposition testimony presented as part of the plaintiff's direct case, Sasseville strenuously denied Shannon's allegations and the allegations of his two daughters, but agreed that he had molested a third daughter on one occasion by touching her breasts. (The third daughter had already testified that it was on more than one occasion and that Sasseville had touched her genitals as well as her breasts.) On cross-

---

[3] Sasseville objected to this testimony as highly prejudicial under Rule 403. Before trial (and confirmed at trial), I ruled that under Fed. R. Evid. 415, evidence of a defendant's commission of other acts of child molestation is admissible if it does not create undue prejudice. Here, the acts at issue were factually similar (genital touching of children of approximately the same age in the family home in contiguous time periods) and relevant. I specifically limited the plaintiff's direct examination of the Sasseville daughters to avoid the presentation of unduly inflammatory details.

2

examination, Sasseville's lawyer questioned the credibility of all three Sasseville daughters. Sasseville's niece and his sister testified that one of the daughters had made inconsistent statements about abuse. Sasseville also took the stand and reiterated his denials. In rebuttal, Shannon called one of Sasseville's former therapists who testified that Sasseville had previously acknowledged molesting one daughter not once (as he had testified) but three times.

The jury returned a verdict finding that Sasseville had molested Shannon and awarded $150,000 in compensatory damages. Sasseville moved for judgment as a matter of law, and I denied the motion from the bench. The jury next heard testimony from Sasseville regarding his financial condition, arguments from counsel, and new jury instructions regarding the imposition of punitive damages. After deliberating a few hours, the jury then awarded Shannon $1,100,000 in punitive damages. Sasseville moved for judgment as a matter of law on that damage award, and I denied the motion from the bench.

Sasseville now renews his motion for judgment as a matter of law regarding the punitive damage award, moves for a new trial on punitive damages, and, alternatively, moves to reduce the punitive damage award (remittitur) on the basis that it is excessive as a matter of law.

## ANALYSIS

Jurisdiction here is based upon diversity of citizenship, and the parties agree that Maine law applies.

### *(1) The Standards*

The standard for granting a Rule 50 motion for judgment as a matter of law is that, considering all the evidence in the record, no reasonable jury could have reached the same result.  See Monteagudo v. Asociacion de Empleados del Estado Libre Asociado, 554 F.3d 164, 170 (1st Cir. 2009).  As a judge, I do not weigh the evidence or determine credibility on such a motion, and I draw all reasonable inferences in favor of the verdict, disregarding "all evidence favorable to the moving party that the jury is not required to believe."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000) (citation omitted).

By contrast, on a motion for a new trial under Rule 59, I independently weigh the evidence and consider the credibility of witnesses to determine if the jury's verdict was clearly against the weight of the evidence and therefore represents a miscarriage of justice.  Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009).  But I am not a "thirteenth juror[ ]," free to overturn a verdict because I might have reached a different result had I been the finder of fact in the first instance.  Id. (citing Coffran v. Hitchcock Clinic, Inc., 683 F.2d 5, 6 (1st Cir. 1982)).  A new trial is warranted only if a verdict goes "against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice."  Marcoux v. Shell Oil Prods. Co. LLC, 524 F.3d 33, 40 (1st Cir. 2008) (quoting Whitfield v. Melendez-Rivera, 431 F.3d 1, 9 (1st Cir. 2005)).

Under Maine law, punitive damages may be imposed if a tortfeasor acts deliberately with "express" or "actual" malice, or so outrageously that malice

can be implied.  <u>Tuttle v. Raymond</u>, 494 A.2d 1353, 1361 (Me. 1985).  The standard of proof is clear and convincing evidence.  <u>Id</u>.

Even if the imposition of punitive damages is proper under state law, it still must be measured against federal constitutional standards.  But the award will be upheld "unless it clearly appears that the amount of the award exceeds the outer boundary of the universe of sums reasonably necessary to punish and deter the defendant's conduct."  <u>Cabral v. United States DOJ</u>, 587 F.3d 13, 25 (1st Cir. 2009) (quoting <u>Zimmerman v. Direct Fed. Credit Union</u>, 262 F.3d 70, 81 (1st Cir. 2001)).  If a punitive damage award violates "elementary notions of fairness [that] . . . dictate that a person receive fair notice . . . of the severity of the penalty that a State may impose," <u>BMW of N. Am. v. Gore</u>, 517 U.S. 559, 574 (1996), then the judge may ascertain the appropriate amount of an award and enter judgment in that reduced amount, <u>see</u> <u>Mendez-Matos v. Mun. of Guaynabo</u>, 557 F.3d 36, 52 (1st Cir. 2009) (citing <u>Bisbal-Ramos v. City of Mayaguez</u>, 467 F.3d 16, 27 (1st Cir. 2006)).

*(2)*    ***Evidentiary Basis for Punitive Damages***

Based on all the evidence presented at trial, the jury reasonably could find that Sasseville deliberately molested his seven-year-old nephew/godson and that Sasseville's act was part of a pattern of using his familial position of authority and trust to abuse children in his family.  The jury reasonably could find by clear and convincing evidence that Sasseville's actions were so outrageous as to imply the malice required for the imposition of punitive damages under Maine law.  See <u>Caron v. Caron</u>, 577 A.2d 1178, 1180 (Me.

5

1990) (noting that punitive damages are "entirely proper in a case of . . . child abuse"). The cumulative and credible testimony of Shannon, of Sasseville's daughters, and of his former psychologist severely undercut the credibility of Sasseville's denials. It is simply not possible to find that the evidence does not support the jury's award of punitive damages or that the punitive damage award was against the clear weight of the evidence.

The defendant's Motion for Judgment as a Matter of Law and his Motion for a New Trial regarding the imposition of punitive damages are therefore **DENIED**.

*(3)     The Amount of Punitive Damages*

Sasseville argues that the punitive damage award is excessive in light of the factors that the jury had to consider under Maine law and under federal due process limitations on the size of punitive damage awards.

Under Maine law, a fact finder "must weigh 'all relevant aggravating and mitigating factors'" presented by the parties, including the "egregiousness of the defendant's conduct,"[4] when determining the appropriate amount of an award. Tuttle, 494 A.2d at 1359 (quoting Hanover Ins. Co. v. Hayward, 464 A.2d 156, 158-59 (Me. 1983)). "Aggravating factors may include whether the defendant's conduct was 'intentional, wanton, malicious, reckless, or grossly

---

[4] Under Tuttle, another factor for the jury to consider is any criminal punishment that may have been imposed for the conduct in question, 494 A.2d at 1359, but here no such information was presented to the jury.

6

negligent.'" Hanover Ins. Co, 464 A.2d at 158 (quoting Oliver v. Martin, 460 A.2d 594, 595 (Me. 1983)).[5]

Under federal constitutional law, the judge must evaluate whether a punitive damage award is excessive by considering: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." Mendez-Matos, 557 F.3d at 52 (quoting BMW, 517 U.S. at 574-75).[6] To measure the degree of reprehensibility—and thus the need for punishment and deterrence—I consider whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit,

---

[5] Mitigating factors such as the "defendant's good faith" are not relevant here. Hanover Ins. Co., 464 A.2d at 158 (citation omitted).

[6] In BMW, the Supreme Court compared a punitive damage award to "the civil or *criminal* penalties that could be imposed for comparable misconduct." 517 U.S. at 583 (emphasis added). In State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003), however, the Court noted that while the "existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action," it is of "less utility" in "determin[ing] the dollar amount of the award," and the Court cautioned that "[g]reat care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed." 538 U.S. at 428 ("[T]he remote possibility of a criminal sanction does not automatically sustain a punitive damages award."). The First Circuit has recognized the difficulty of equating criminal fines and imprisonment to civil penalties but continues to consider the existence of criminal penalties as indicating the state's interest in punishing and deterring certain conduct, Mendez-Matos, 557 F.3d at 55 (citing BMW, 517 U.S. at 583), as I do in text in section 3(c), Penalties in Comparable Cases.

or mere accident." Cabral, 587 F.3d at 26 (quoting State Farm, 538 U.S. at 419).

Thus, the factors for assessing the excessiveness of an award under federal constitutional law largely overlap those of Maine law.[7] Given the substantial overlap, I evaluate them together. See Harris v. Soley, 756 A.2d 499, 510 (Me. 2000) (noting that because several aggravating factors considered under Maine law are "coextensive" with federal criteria, they did not need to be analyzed separately from constitutional issues).

Sasseville contends that while the jury may have found that he acted reprehensibly, the battery of Shannon was not as reprehensible as other acts of sexual abuse. Def.'s Mot. for New Trial at 6. He also says that the punitive damage award is not reasonably related either to Shannon's actual damages or to criminal fines that Sasseville might have incurred. See id. at 7-9. Finally, he contends that the size of the punitive damage award demonstrates that the jury was "inappropriately influenced" by evidence that he molested his daughters, id. at 1, and that my jury instruction regarding punitive damages improperly allowed the jury to consider harm to the daughters in deciding both

---

[7] The Maine standard differs from the federal by requiring that a punitive damage award be "individualized" according to a defendant's wealth in order to "ensure a sufficient award in the case of a rich defendant and avoid an overburdensome one where the defendant is not as wealthy." Tuttle, 494 A.2d at 1359 (citation omitted). Here, the jury received evidence at trial showing that Sasseville has assets of more than $3 million and an annual post-retirement income of roughly $166,000. I find that under Maine law, the jury's $1.1 million award is reasonably related to Sasseville's financial condition. See Caron, 577 A.2d at 1181 (upholding a punitive damage award of $110,000 relative to annual income of $234,000 and $285,000 in total assets).

8

*whether* to impose punitive damages and *how much* the punitive damage award should be, id. at 2.

### (a) Degree of Reprehensibility

First, I address the requirement of Philip Morris USA v. Williams, 549 U.S. 346 (2007). Philip Morris stands for the proposition that a jury may not impose punitive damages to punish a defendant for "harm caused strangers to the litigation." 549 U.S. at 357. But the Philip Morris Court also recognized that "harm to others shows *more reprehensible* conduct." Id. at 355 (emphasis added); see also id. at 357 ("[C]onduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few."). Philip Morris did not overrule the principle that "evidence that a defendant has repeatedly engaged in prohibited conduct . . . [can show] that strong medicine is required to cure the defendant's disrespect for the law." BMW, 517 U.S. at 577 ("[A] recidivist may be punished more severely than a first offender."); see also Philip Morris, 549 U.S. at 357 (noting that recidivism statutes do not impose an "additional penalty for the earlier crimes, but instead . . . a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one" (quoting Witte v. United States, 515 U.S. 389, 400, (1995)).

Here, I charged the jury explicitly that jurors *could* consider Sasseville's molestation of his daughters to measure the reprehensibility of his conduct toward Shannon, but that they *could not* punish Sasseville for harm he caused

anyone other than Shannon.[8] Sasseville points to no direct evidence suggesting that the jury did not follow my instruction. See United States v. Sampson, 486 F.3d 13, 39 (1st Cir. 2007) ("Jurors are normally presumed to follow the trial court's instructions." (citing Jones v. United States, 527 U.S. 373, 394 (1999)). I conclude that the jury instruction satisfied the Philip Morris standard. Sasseville's speculation that the size of the jury's award shows that the jury must not have been able to "make the Orwellian . . . evidentiary distinction" between considering harm to others for the purpose of

---

[8] Sasseville maintains that the instruction I gave allowed the jury to ask the "wrong question," Def.'s Reply Br. at 3 (Docket Item 192), namely, whether punitive damages should be used to punish a defendant for "harm caused strangers," Philip Morris, 549 U.S. at 355. That is precisely what my instruction told the jury *not* to do. My instruction stated:
> In deciding whether to award punitive damages and in determining the amount of any such damages, you may consider all aggravating and mitigating factors indicated by the evidence, including the reprehensibility of Sarto Sasseville's conduct toward Michael Shannon and the ability of Sarto Sasseville to pay such an award. In assessing the degree of reprehensibility, you may consider whether Sarto Sasseville had engaged in prior similar conduct. However, *the amount of punitive damages that you award Michael Shannon must be reasonably related to the harm to Michael Shannon. You may not punish Sarto Sasseville in this lawsuit for harm he may have caused to others.*

(Emphasis added.) This language tracks the jury instruction that the Supreme Court said that the lower court withheld improperly in Philip Morris:
> [Y]ou may consider the extent of harm suffered by others in determining what [the] reasonable relationship is between [the defendant's] punishable misconduct and harm caused to [the plaintiff], [but] you are not to punish the defendant for the impact of its alleged misconduct on other persons, who may bring lawsuits of their own in which other juries can resolve their claims.

549 U.S. at 356. Sasseville did propose a punitive damage verdict form that would have told the jury that the daughters' testimony could be considered when deciding *whether* to impose punitive damages but could not be considered in determining the *amount* of the damages. Def.'s Proposed Punitive Damage Verdict Form (Docket Item 156). But confusingly, his proposed jury instruction said that the jury could "not consider any of that testimony in determining whether to award plaintiff punitive damages or, if you decide to award punitive damages, the amount of those damages." Def.'s Proposed Jury Instruction Nos. 11 & 12 at 3 (Docket Item 141). In any event, Sasseville did not propose alternate language consistent with Philip Morris that could have better articulated to the jury the distinction that Philip Morris makes.

10

determining that his acts were reprehensible and not considering it when "arriving at the *level* of punitive damages," Def.'s Mot. for New Trial at 2, is only that—*speculation*. Under Philip Morris, the jury was entitled to consider the prior misconduct in assessing the reprehensibility of Sasseville's conduct toward Shannon, and I turn to that reprehensibility.

Reprehensibility is the "most important" factor in the test set out by the Supreme Court in BMW v. Gore. Mendez-Matos, 557 F.3d at 53 (citing State Farm, 538 U.S. at 419). Sasseville contends that the "act at issue in this case [Sasseville's fondling of his seven-year-old nephew's genitalia] clearly falls at the lower end of the spectrum of wrongful sexual acts," Def.'s Mot. for New Trial at 6, and, considered all by itself as a single act, without any context, is not all that bad (as such things go). Putting aside whether *any* sexual molestation by a trusted adult of a child within a family can be characterized as low on the reprehensibility scale, the jury reasonably could find that Sasseville's molestation of Shannon was not a single act, but one of a series of acts against children within the family. The jury could reasonably conclude that Sasseville took physical advantage of a vulnerable child, as he had on other occasions, with utter disregard for the child's health and safety, and inflicted long-lasting and significant harm on that child. The jury could conclude that Sasseville's molestation of Shannon entailed "a substantial risk of harm to the general public," namely to other children both inside and outside the immediate family, and "so was particularly reprehensible." Philip Morris, 549 U.S. at 355. In sum, it was entirely proper for the jury to consider

11

Sasseville's molestation of his daughters as a measure both of the deliberateness (malice) of his molestation of Shannon and of the amount of damages needed for deterrence. Reprehensibility was high on the scale, and I am content that the jury followed my instruction not to award damages to Shannon for the damage caused to Sasseville's daughters.

### (b)     *Ratio of Harm or Potential Harm and Punitive Damages*

Punitive damages must have a reasonable relationship to "actual or potential harm" suffered by a victim. State Farm, 538 U.S. at 418; see also Cooper Indus. v. Leatherman Tool Group, 532 U.S. 424, 440 (2001); BMW, 517 U.S. at 580; TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 460 (1993) ("It is appropriate to consider . . . the possible harm to other victims that might have resulted if similar future behavior were not deterred."). The Supreme Court has said variously that a one-to-one ratio between compensatory and punitive damages might be the limit in cases with high compensatory awards, State Farm, 538 U.S. at 425; that a four-to-one ratio is "close to" the constitutional limit, Pacific Mutual Life Insurance. Co. v. Haslip, 499 U.S. 1, 23 (1991); and that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," State Farm, 538 U.S. at 425.

Here, the jury heard a stipulation that Shannon's past counseling expenses were $4,840, as well as testimony about future counseling expenses at $200 per hour, subject to some uncertainty about quantity and duration. It also heard about Shannon's past and future emotional distress, which it could

12

legitimately view as substantial. It then imposed compensatory damages of $150,000. The punitive damage award of $1.1 million satisfies Maine's common law standards. See, e.g., Schrader-Miller v. Miller, 855 A.2d 1139 (Me. 2004) (approving a ratio of seven-to-one and referring to a previous case approving a sixteen-to-one ratio, Harris v. Soley, 756 A.2d 499 (Me. 2000)). It also does not conflict with State Farm's warning against anything over a single-digit ratio. But if Haslip's statement—that a four-to-one ratio is "close to" the constitutional limit—suggests a constitutional ceiling of around five-to-one, then the punitive damage award should be capped at roughly $750,000.

Despite the statements of Haslip and State Farm, however, the Supreme Court has steadfastly refused to "impose a bright-line ratio which a punitive damages award cannot exceed." Mendez-Matos, 557 F.3d at 54 (quoting State Farm, 538 U.S. at 424). Instead, it has said that "ratios greater than those we have previously upheld may comport with due process"—for example, if "a particularly egregious act has resulted in only a small amount of economic damages" or if an "injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." State Farm, 538 U.S. at 425 (quoting and citing BMW, 517 U.S. at 582).

Here the $1.1 million punitive damage award is 7.33 times as much as the compensatory damage award. That is a substantial ratio, given the nature and size of the compensatory award, but I cannot conclude that it is unconstitutionally large. The harm at issue here results from a particularly egregious act that took place in secret and abused a relationship of trust. It

13

generated relatively small economic damages, but produced noneconomic damages from psychological trauma likely to persist for years to come, and such damages are difficult to determine. These factors militate in favor of a relatively high ratio of punitive to compensatory damages.

### (c) *Penalties in Comparable Cases*

Finally, I consider the difference between the punitive damages awarded by the jury and the penalties that Sasseville might have faced under Maine law. Maine law does not specifically provide for civil penalties in child abuse cases. Had Sasseville been convicted criminally, he could have faced up to a $20,000 fine and ten years in prison for the crime of unlawful sexual contact. See 17-A M.R.S.A. §§ 255-A(1)(E-1), 1252(2)(B), 1301(1-A)(B).[9] Such criminal penalties are of relatively low utility in determining the appropriate amount of a punitive damage award. Mendez-Matos, 557 F.3d at 55 n.16 (citing State Farm, 538 U.S. at 428). Still, as the First Circuit has noted recently, a penalty of imprisonment for years is "very serious." Id. (five-year term). I take the authorization of a ten-year term of imprisonment for conduct similar to Sasseville's to demonstrate the state's strong interest in punishing and

---

[9] The defendant incorrectly suggests that the act at issue here is a "simple touching," a misdemeanor under 17-A M.R.S.A. § 260(C), which punishes unlawful sexual touching of a person . . . [who] is in fact less than 14 years of age [by an actor that] is at least 5 years older." See Def.'s Mot. for New Trial at 6. Maine defines "sexual touching" as "any touching of the breasts, buttocks, groin or inner thigh, directly or through clothing, for the purpose of arousing or gratifying sexual desire." 17-A M.R.S.A. § 251(G). But the evidence was that Sasseville engaged in "sexual contact." Maine defines "sexual contact" as the "touching of the *genitals* . . . directly or through clothing," 17-A M.R.S.A. § 251(D)) (emphasis added), *i.e.*, not just the groin. See State v. Curlew, 459 A.2d 160, 165 (Me. 1983) (distinguishing genitals from "creases of [the] legs" where they meet the "crotch"). Therefore, Sasseville could have been charged under 17-A M.R.S.A. § 255-A(1)(E-1), which punishes "unlawful sexual contact [with a] person . . . [who] is in fact less than 12 years of age [by an actor that] is at least 3 years older." That is a Class B crime under Maine law.

deterring sexual abuse of children. The existence of this punishment under Maine law should have put Sasseville on notice that, for example, he could have lost up to ten years of earning potential in his work as a dentist. Accordingly, although I do not rely on the third prong of the BMW test in upholding the punitive damage award here, Maine's criminal penalties certainly do not counsel against the award.

In sum, considering the degree of reprehensibility of Sasseville's act, the relation between the punitive damages awarded and the actual and potential harm caused by his conduct, and the existence of tough criminal penalties for similar behavior, the punitive damage award is not excessive under either Maine common law or federal constitutional law.

## CONCLUSION

For the foregoing reasons, the defendant's Motion for Judgment as a Matter of Law, Motion for a New Trial, and Motion for Remittitur are **DENIED**.

**SO ORDERED.**

**DATED THIS 12TH DAY OF FEBRUARY, 2010**

                                        /S/D. BROCK HORNBY
                                        **D. BROCK HORNBY**
                                        **UNITED STATES DISTRICT JUDGE**